**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| THE CLEVELAND BAKERS AND TEAMSTERS HEALTH AND WELFARE FUND and OHIO CONFERENCE OF TEAMSTERS & INDUSTRY HEALTH & WELFARE,     Plaintiffs,<br><br>v.<br><br>DAVID R. MANDEL, M.D., DAVID R. MANDEL, M.D., INC., UNITED BIOSOURCE CORPORATION, now known as "UNITED BIOSOURCE," a wholly owned subsidiary of United Biosource Holdings, Inc., EVERNORTH HEALTH, INC., formerly known as "EXPRESS SCRIPTS HOLDING COMPANY," EXPRESS SCRIPTS, INC., PRIORITY HEALTHCARE CORP., doing business as "CURASCRIPT SD," PROIRITY HEALTHCARE DISTRIBUTION, INC., doing business as "CURASCRIPT SPECIALTY DISTRIBUTION SD," CURASCRIPT SD and ACCREDO HEALTH GROUP, formerly known as "CURASCRIPT S.P.,"<br>    Defendants. | CIVIL ACTION<br><br><br><br>NO.  24-5303 |

HODGE, J.                                                                                          **March 30, 2026**

## MEMORANDUM

This case concerns an alleged scheme by non-party Mallinckrodt ARD LLC ("Mallinckrodt"), the manufacturer of the prescription drug H.P. Acthar Gel ("Acthar"), and a conglomerate of United Biosource Corporation; Evernorth Health, Inc.; Express Scripts, Inc.; Priority Healthcare Corp.; Priority Healthcare Distribution, Inc.; Curascript SD; and Accredo

Health Group, Inc. (together, the "Express Scripts Entities"), as well as David R. Mandel, M.D. and David R. Mandel, M.D., Inc. (the "Mandel Defendants" and together with the Express Scripts Entities, "Defendants") to remove Acthar from retail distribution and raise its price by over 100,000%. Plaintiffs, the Cleveland Bakers and Teamsters Health and Welfare Fund ("Cleveland Bakers") and Ohio Conference of Teamsters & Industry Health & Welfare Fund ("Ohio Teamsters") (together, "Plaintiffs"), are third party payors seeking to recover overpayments for Acthar caused by Defendants' alleged scheme to inflate the price of the drug.

Before the Court are the Express Scripts Entities' Motion to Dismiss the Complaint (ECF No. 24), Plaintiffs' response in opposition (ECF No. 29), and the Express Scripts Entities' reply to Plaintiffs' opposition (ECF No. 30), as well as the Mandel Defendants' Motion to Dismiss the Complaint (ECF No. 46 (together with ECF No. 24 the "Motions to Dismiss")) and Plaintiffs' response in opposition (ECF No. 48). Also before the Court are the Parties' notices of supplemental authority in support of their briefing on the Motions to Dismiss (ECF Nos. 31, 32, 33, 49, 50, 51), as well as Plaintiffs' Motion to Strike the Express Scripts Entities' Notices of Supplemental Authority (ECF No. 34), the Express Scripts Entities' response thereto (ECF No. 35), and Plaintiffs' reply in further support of their Motion to Strike (ECF No. 38).

Plaintiffs' Complaint (ECF No. 1 ("Compl.")) alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Counts 1–2), violation of the Ohio Consumer Sales Protection Act (Count 3), negligent misrepresentation (Count 4), aiding and abetting (Count 5), unjust enrichment (Count 6), violation of the Sherman Act (Counts 7–8), and conspiracy to defraud (Count 9), and requests declaratory and injunctive relief (Count 10). For the reasons that follow, Defendants' Motions to Dismiss are granted.

## I.     FACTUAL BACKGROUND[1]

The following allegations are taken from the Complaint, and the Court accepts, as it must, all non-conclusory allegations as true for the purposes of the Motions to Dismiss.

### i.     The Parties[2]

Mallinckrodt manufactures, markets, distributes, and sells Acthar. (Compl. ¶ 2.) Acthar is an adrenocorticotropic hormone ("ACTH"), which causes the body to produce cortisone and other steroid hormones. (*Id.* ¶ 125.) The FDA has approved Acthar for two indications on its label: monotherapy for the treatment of infantile spasms ("IS") and treatment of acute exacerbations of Multiple Sclerosis ("MS"). (*Id.* ¶¶ 124, 210.)[3] In July 2001, Questcor Pharmaceuticals, Inc. ("Questcor") acquired Acthar from Aventis Pharmaceutical Products, Inc. for $100,000. (*Id.* ¶ 229.) Mallinckrodt acquired Questcor for approximately $5.9 billion in 2014.[4] (*Id.* ¶ 91.) In October 2020, Mallinckrodt filed for Chapter 11 bankruptcy in Delaware. *In re Mallinckrodt PLC,*

---

[1] The Court adopts the pagination supplied by the CM/ECF docketing system.

[2] The Court notes that the Complaint incorrectly defines "Defendants" as Mallinckrodt and Express Scripts (Compl. ¶¶ 89, 121), but Mallinckrodt is not and has never been a defendant in this action. The Court cannot evaluate allegations that do not state with particularity which Defendant (or non-party) they relate to. (*See, e.g., id.* ¶¶ 285, 461, 462, 651f, 664.) If Plaintiffs choose to replead, they must clearly articulate which allegations in the amended complaint refer to what parties and non-parties to this action.

[3] The Complaint is unclear regarding what indications Acthar is currently approved for. Plaintiffs allege that Acthar was approved by the FDA in 1952 for over 50 conditions, and this list has been reduced to "19 indications" in the present day. (*Id.* ¶ 123.) However, the Complaint also alleges that "the FDA has only ever approved Acthar for two narrow indications: Infantile Spasms (IS) and acute exacerbations of multiple sclerosis (MS). It has never been approved for the long-term treatment of any disease." (*Id.* ¶ 124.) Plaintiffs do not provide any further information regarding this discrepancy.

[4] Throughout the Complaint, Plaintiffs inconsistently refer to Questcor and Mallinckrodt as interchangeable entities. The same is true of other legacy and present-day entities, such as Healthbridge and UBC, which Plaintiffs also sometimes refer to as "UBC/Healthbridge." For simplification purposes the Court refers to all entities by their current, non-legacy name, including when they were in their legacy form.

Case No. 1:20-bk-12522 (Bankr. D. Del.) (the "Bankruptcy Proceedings"); (*Id.* ¶ 94). In April 2022, claims against Mallinckrodt arising prior to October 2020 and similar to those asserted against Defendants here were discharged in the Bankruptcy Proceedings. (Compl. ¶ 169.) Mallinckrodt is not, nor has it ever been, a party to the current action.

Plaintiffs Cleveland Bakers and Ohio Teamsters are third party payors ("TPPs") who provide healthcare benefits, including prescription drug benefits, to their employees through contracts with other healthcare organizations. (*Id.* ¶¶ 81–88.)[5]

Express Scripts, Inc. ("Express Scripts") is a pharmacy benefits manager ("PBM") that processes claims for prescription drugs, including specialty drugs, and facilitates the direct distribution of prescription drugs from the factory to the patient's home. (*Id.* ¶¶ 497–98.) Express Scripts is a subsidiary of Evernorth Health, Inc., f/k/a Express Scripts Holding Company. (*Id.* ¶ 109.)

CuraScript, Inc., d/b/a Curascript, SD, f/k/a CuraScript Pharmacy, Inc. ("CuraScript") is a wholly owned subsidiary of Express Scripts. (*Id.* ¶ 110.) It was acquired by Express Scripts in January 2004 and was expanded when Express Scripts acquired Priority Healthcare Corporation in October 2005. (*Id.*) CuraScript was Mallinckrodt's exclusive specialty drug distributor for Acthar from August 2007 until April 2022. (*Id.* ¶ 111.)

Accredo Health Group, Inc., f/k/a CuraScript S.P. ("Accredo") is a specialty pharmacy that dispenses Acthar to patients. (*Id.* ¶ 503.) It is a wholly owned subsidiary of Express Scripts. (*Id.*

---

[5] The Complaint discusses irrelevant allegations related to plaintiffs that are not parties to this lawsuit, including the International Union of Operating Engineers Local 542 ("IUOE Local 542"), Acument, and Rockford. (*See, e.g.*, Compl. ¶¶ 417, 433–36, 452, 456, 506, 512.) These allegations are a reflection of the seemingly piecemeal approach that Plaintiffs have taken in drafting their Complaint, stitching together allegations from prior Acthar complaints and leaving this Court to parse through what allegations are actually relevant to Plaintiffs' claims here.

¶ 112.) Accredo received Acthar from CuraScript and dispensed it to Plaintiffs, who then sent the Acthar to the homes of their beneficiaries. (*Id.* ¶ 724.)

United BioSource ("UBC"), f/k/a Healthbridge, provides reimbursement and other support services to drug manufacturers. (*Id.* ¶¶ 115, 499–500.) As a hub, UBC was responsible for controlling Acthar prescription processing and benefits coordination with patients and TPPs. (*Id.* ¶ 119.) UBC acted as Mallinckrodt's exclusive agent in the processing and distribution of Acthar prescriptions through the Acthar Support and Access Program ("ASAP"). (*Id.* ¶¶ 118, 526.) Doctors would call Acthar prescriptions into the hub, which would confirm and authorize insurance coverage. (*Id.* ¶ 276.) Then, the hub would direct Accredo to fill the prescription. (*Id.* ¶ 509.) CuraScript, Accredo, and UBC were all wholly-owned subsidiaries of Express Scripts from 2007 through 2017. (*Id.* ¶¶ 109–10, 112, 117.) Express Scripts sold UBC in November 2017 to Avista Capital Partners. (*Id.* ¶ 117.)

Dr. David R. Mandel is a rheumatologist with offices located in Ohio. (*Id.* ¶ 95.) David R. Mandel, Inc. is a medical practice group also located in Ohio and owned by Dr. Mandel. (*Id.* ¶ 96.) Dr. Mandel was a "top prescriber of Acthar" and made up 1% of all prescriptions for Acthar. (*Id.* ¶ 97.) He prescribed Acthar to members of the Cleveland Bakers. (*Id.*)

### ii.    The "New Strategy"

In 2007, Mallinckrodt and Express Scripts created a so-called "new strategy" for selling, distributing, and marketing Acthar. (*Id.* ¶ 244–45.) This new strategy involved "re-launch[ing]" Acthar with a limited distribution system at a higher price to make it appear as if the product were a new product "being launched as the only product indicated for IS," which was an "off-label"

indication until the FDA approved it in 2010.[6] (*Id.* ¶ 265.) Mallinckrodt and the Express Scripts Entities would then work to market the drug for additional off-label indications to increase demand for the drug.[7] (*Id.* ¶ 467.) As Plaintiffs allege, the scheme was comprised of three parts: distribution, pricing, and marketing.

### 1. The Distribution Scheme

In 2006, Express Scripts proposed that Mallinckrodt remove Acthar from wholesale distribution and move it to exclusive "specialty" distribution through CuraScript. (*Id.* ¶¶ 5–6, 13.) Acthar would then be labelled a "specialty pharmaceutical," although it had never been deemed "special" before. (*Id.* ¶ 6.) The distribution scheme limited the distribution of Achtar from multiple wholesale and retail outlets to just one, exclusive outlet, CuraScript—a subsidiary of Express Scripts—after June 2007. (*Id.* ¶¶ 13, 254.) CuraScript engaged UBC to act as the "hub" that processed Acthar prescriptions and coordinated benefits with patients and TPPs. (*Id.* ¶ 499.) Accredo was engaged as the preferred specialty pharmacy. (*Id.* ¶ 498, 502)

As part of the distribution scheme, Mallinckrodt and UBC created the ASAP. (*Id.* ¶ 272.) Under the ASAP, a patient or physician seeking an Acthar prescription was directed to UBC and then required to return the Acthar Start Form to UBC. (*Id.* ¶¶ 209, 273.) UBC then confirmed the Acthar prescription with the provider, confirmed the patient's insurance coverage, and arranged

---

[6] As defined by the Complaint, "off-label" refers to the use of a drug for any purpose other than what is described in the drug's labeling. (*Id.* ¶ 143.) For Acthar, off-label use included prescribing the drug for any condition other than its two FDA-approved uses—IS and MS, although as noted in this opinion the Complaint contains discrepancies as to how many uses the FDA has actually approved the drug for. (*Id.* ¶ 124.)

[7] The Complaint discusses at length the background of certain members of Questcor's Board of Directors and their respective departures from the company or financial gains after the "new strategy" was adopted. (*Id.* ¶¶ 233–64.) These circumstantial facts do not have bearing on the merits of Plaintiffs' claims.

for the Acthar to be delivered to the patient by CuraScript. (*Id.* ¶¶ 275–76.) The Acthar Start Form also authorized UBC or any other operator of the ASAP to provide Acthar and receive payment for it from the patient and/or the TPP. (*Id.* ¶¶ 275–76, 279.) Possession and title to Acthar passed from Mallinckrodt to the patient and TPP after UBC's sign-off on the Acthar Start Form. (*Id.* ¶ 282.) The Acthar Start Form also authorized Mallinckrodt and UBC to provide certain services to the patient, including home injection training, which UBC arranged for. (*Id.* ¶¶ 280, 286.)

In exchange for agreeing that the Express Scripts Entities would exclusively distribute Acthar, Express Scripts allegedly agreed with Mallinckrodt to raise the price of Acthar 100,000%. (*Id.* ¶¶ 1, 188.) Mallinckrodt signed contracts with CuraScript and UBC in June 2007 memorializing the exclusive distribution of Acthar and that UBC would be the exclusive hub for the ASAP. (*Id.* ¶ 254.) The companies publicly announced the exclusive relationship in July 2007. (*Id.* ¶¶ 488, 508–09.) This exclusive arrangement between the Express Scripts Entities and Mallinckrodt lasted from 2007 through 2017. (*Id.* ¶ 716.)

### 2. The Pricing Scheme

At the time that Mallinckrodt (then Questcor) acquired Acthar in July 2001, the end payor price or average wholesale price ("AWP") for a vial was approximately $40. (*Id.* ¶ 290.) In September 2001, Mallinckrodt raised the AWP to $935.20. (*Id.* ¶ 294.) From 2001 until 2007, the Acthar AWP grew from $935.20 to $2,062.79. (*Id.* ¶ 293.) Once the exclusive distribution scheme was implemented, from August 2007 through 2018 Mallinckrodt and Express Scripts agreed to raise the AWPs of Acthar to over $40,000. (*Id.* ¶ 314.) This agreement to set the price of Acthar was allegedly reflected in contracts, agreements, and understandings between Mallinckrodt and the Express Scripts Entities. (*Id.* ¶ 651c.) Moreover, the Express Scripts Entities "did not push back" on the price increases. (*Id.* ¶ 526.)

7

In 2007, Express Scripts' Chief Medical Officer, Steve Miller, stated that "[t]he increase was a manufacturing decision," meaning it was Mallinckrodt's decision, and he "[could not] comment on it." (*Id.* ¶ 331.) In May 2017, Express Scripts' Senior Vice President, Supply Chain and Specialty Pharma, Everett Nevill, stated in response to a question during a private investor conference, "I think everybody in our company would agree, that the product is vastly overpriced for the value. We don't set the price. We've told [Mallinckrodt] that. I personally told [Mallinckrodt's] management team that their drug is hugely overpriced. I know Steve has as well." (*Id.* ¶ 333.)

### 3. The Marketing Scheme

The marketing scheme promoted by Defendants and Mallinckrodt allegedly sought to broaden the customer base of Acthar by promoting it for unapproved uses and doses, misrepresenting the efficacy of Acthar, and issuing false statements about the reasons that the price of Acthar increased.

The Complaint describes Mallinckrodt's "white coat marketing scheme" used for off-label promotion of Acthar for new indications. (*Id.* ¶¶ 380–86.) Through this scheme, Mallinckrodt and the Express Scripts Entities bribed Mallinckrodt's "key opinion leaders" or "KOLs" from around the country to serve as "spokes-doctors" to promote prescriptions of Acthar for unapproved uses and doses. (*Id.* ¶¶ 356, 469.) One such unapproved use was a "dosing scheme" that used Acthar as a form of "pulse therapy" for treatment of MS. (*Id.* ¶ 191.) Mallinckrodt allegedly bribed certain KOLs through compensation for their "loyalty" to the company, including for speaking at various engagements about Acthar's off-label uses. (*Id.* ¶¶ 15, 378–79, 399.)

The "white coat marketing scheme" also involved the creation of a new position, Medical Science Liaison ("MSL"). (*Id.* ¶ 351.) MSLs were sales employees who were deployed to speak

to doctors about the safety and efficacy of Acthar for unapproved uses and doses, and also provided periodic training to employees of UBC. (*Id.* ¶¶ 351–52.)

Additionally, the marketing scheme funneled tens of millions of dollars to UBC to run a "patient assistance program" ("PAP") to reduce co-pays for patients. (*Id.* ¶ 15.) The PAP allegedly allowed Mallinckrodt to shift the costs of Acthar to private payors. (*Id.* ¶ 427.) Mallinckrodt paid copay subsidies to a foundation called the Chronic Disease Fund ("CDF") then UBC sent Medicare and private payor patients to the CDF to receive the subsidies, which were used for Acthar to the exclusion of other drugs. (*Id.* ¶¶ 429–30.)

Mallinckrodt also allegedly used UBC's reimbursement specialists as a mouthpiece to deliver a false message about the value of Acthar relative to its price, why Acthar's price increased, Acthar's unapproved uses and doses, and its benefits in relation to other treatments. (*Id.* ¶¶ 173–74.) The UBC reimbursement specialists were "directly trained by Mallinckrodt" and followed the Standard Operating Procedure ("SOP") created by Mallinckrodt. (*Id.* ¶¶ 175, 424.) The SOP included a section on off-label usage of Acthar and the process by which UBC was to approve off-label prescriptions. (*Id.* ¶ 175.) The SOP also reflected that Mallinckrodt knew that the "exact mechanisms of action of [Acthar] in the treatment of infantile spasms [were] not fully understood," but this lack of understanding allegedly did not impact their training of UBC's reimbursement specialists, who were responsible for passing on Mallinckrodt's messages about Acthar's uses and benefits. (*Id.* ¶¶ 406, 412–13.)

Plaintiffs also allege that the SOP shows that UBC was "trained to misrepresent the reasons for the 2007 price increase" and provided talking points for UBC personnel to use when discussing the price increase with doctors, patients, and representatives of TPPs. (*Id.* ¶ 183.) The Mallinckrodt-supplied talking points explained that Acthar's price increase was necessary to ensure the drug's "long term viability and availability" and that it had "never been a profitable drug because it is not only a difficult and expensive drug to manufacture, but is also a highly specialized, very low volume product." (*Id.* ¶ 183.) Additionally, the talking points explain that the National Organization for Rare Disorders ("NORD") set up a rationing program for Acthar in the 1990s since it was often not available during that time. (*Id.*)

### 4. *Dr. Mandel's Role in the Marketing Scheme*

Plaintiffs allege that Dr. Mandel "routinely prescribed Acthar" to patients, including a beneficiary of Cleveland Bakers, for unapproved doses and uses, including rheumatoid arthritis ("RA"), an off-label indication. (*Id.* ¶¶ 101, 228, 394, 402.) Dr. Mandel also allegedly misrepresented to patients and payors Acthar's "mode of action" and its limited FDA approval. (*Id.* ¶¶ 102, 398.) These alleged misrepresentations were memorialized in letters of medical necessity written by Dr. Mandel appealing TPPs' denial decisions for Acthar prescriptions. (*Id.* ¶¶ 103-04, 395.) Dr. Mandel sent these letters to UBC, which reviewed them then sent them to TPPs. (*Id.* ¶¶ 103, 396.)

### i.      The Synacthen Acquisition

Through its price increases, Mallinckrodt increased its revenue from Acthar sales from less than $1 million in 2001 to $798.9 million in 2013. (*Id.* ¶ 535.) Mallinckrodt was able to achieve this increase in part because, at all times relevant to this case, there were no reasonably available

substitutes for Acthar and therefore Mallinckrodt possessed monopoly power in the relevant product market. (*Id.* ¶ 547.)

In 2009, Mallinckrodt identified a competitive threat to its monopoly power in the ACTH market—Novartis AG's Synacthen Depot ("Synacthen"), a synthetically derived ACTH medication. (*Id.* ¶¶ 536, 562.) Synacthen had not yet been approved by the FDA, but Mallinckrodt recognized that potential entry of Synacthen in the U.S. market for ACTH drugs would threaten its monopoly. (*Id.* ¶¶ 536, 558.) In 2009, Mallinckrodt tried to buy the rights to the drug but failed. (*Id.* ¶ 536.) In 2013, Novartis agreed to sell Synacthen to Retrophin, Inc. (*Id.* ¶¶ 537, 572–73.) However, Mallinckrodt disrupted the bidding process for Synacthen and licensed Synacthen from Novartis for at least more than eight times what Retrophin had agreed to buy the drug for. (*Id.* ¶ 538, 557, 574–75.) Mallinckrodt did not seek FDA approval to bring Synacthen to market after it bought the rights. (*Id.* ¶ 538.) Instead, Mallinckrodt kept it off the market and raised Acthar prices. (*Id.* ¶¶ 539–40, 575.)

### ii.    Related Lawsuits

The Express Scripts Entities are defendants in multiple lawsuits brought by various other TPPs, including TPPs represented by Plaintiffs' counsel in this action. Plaintiffs describe at length in their Complaint various actions that name Mallinckrodt as a Defendant but that do not name the Express Scripts Entities or Dr. Mandel. For purposes of evaluating Defendants' Motions to Dismiss, the Court has focused on the federal actions Plaintiffs and Defendants have identified in their papers that directly pertain to the parties and issues in this case.[8] (*See, e.g.*, *id.* ¶¶ 19–30, 31–41; ECF No. 30 at 7.)

---

[8] The parties have filed various notices of supplemental authority on the docket, which the Court has taken into consideration as appropriate. (*See* ECF Nos. 31, 32, 33, 37, 41, 49, 50, 51.) Plaintiffs

### 1. The Rockford Case

In April 2017, Plaintiffs' counsel in this case filed a class action in the Northern District of Illinois on behalf of the City of Rockford, Illinois ("Rockford") and Acument Global Technologies Inc. ("Acument") and a putative class of similarly situated TPPs, including Plaintiffs in this litigation, against Mallinckrodt and the Express Scripts Entities.[9] *City of Rockford v. Mallinckrodt ARD, Inc., et al.*, No. 3:17-cv-50107 (N.D. Ill.); (Compl. ¶ 23). The second amended complaint alleged that Mallinckrodt and the Express Scripts Entities violated federal and state antitrust and consumer protection laws, RICO, and various other state laws by illegally maintaining and enhancing Mallinckrodt's monopoly power in the ACTH market. *See City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 743 (N.D. Ill. 2019). On January 25, 2019, the *Rockford* court denied in part the Express Scripts Entities' motions to dismiss, permitting Rockford's antitrust claims to proceed and allowing plaintiffs leave to replead. *Id.* at 778. The

filed a Motion to Strike Defendants' Notices of Supplemental Authority. (ECF No. 34.) The Supplemental Authority Notices at issue in the Motion to Strike (ECF Nos. 32, 33) notified the Court of orders entered by the Honorable Paula Patrick, Philadelphia Court of Common Pleas, issued on August 20, 2024 and January 22, 2025 in *Law Enforcement Health Benefits, Inc. v. Greenhouse*, Case No. 240301976 (Pa. Com. Pl. Jan. 21, 2025) ("LEHB"). Plaintiffs' Motion to Strike notes that Judge Patrick recused herself from the case and the January 22, 2025 LEHB Order was vacated. (ECF No. 34 at 2–4.) Plaintiffs also assert that Judge Patrick's prior orders in the case, including the August 20, 2024 LEHB Order, were rendered void as a matter of law. (*Id.*) The August 20, 2024 LEHB Order was vacated shortly after Plaintiffs filed their Motion to Strike. (ECF No. 37 at 2.) The Court notes that Defendants immediately notified the Court on their own volition that the two LEHB orders they previously cited in their notices of supplemental authority were vacated. (ECF Nos. 33, 37.) The Court urges the parties to avoid unnecessary motions practice in the future and follow this Court's order in this case requiring that "[s]even (7) days prior to any motion being filed . . . counsel must notify opposing counsel to discuss the substance of the potential motion, and the possible resolution of the same." (ECF No. 3 at 1.)

[9] The Complaint in this case appears to inadvertently include allegations copied over from the Rockford complaint. (*See, e.g.*, Compl. ¶¶ 505–06, 512.) The Court has disregarded these allegations.

*Rockford* court found that Acument did not have antitrust standing for the federal claims because the plaintiff did not plausibly allege that it was a direct purchaser from a member of the alleged conspiracy. *Id.* at 752. The court did find that Rockford had alleged antitrust standing, and that it had plausibly stated both Section 1 and Section 2 claims under the Sherman Act against Mallinckrodt and the Express Scripts Entities based on (1) the exclusive dealing arrangement and (2) the Synacthen acquisition. *Id.* at 754–57.

The *Rockford* court dismissed the RICO claims for failure to adequately plead the predicate acts of mail and wire fraud under the Rule 9(b) standard. *Id.* at 773–74. The court noted that "plaintiffs allege little more than the existence of a price-fix scheme and defendants' intent to misrepresent prices, which is different than alleging the 'who, what, when, where and how' of an actual misrepresentation." *Id.* at 774 (citations omitted). Additionally, the court held that plaintiffs had inadequately pled proximate cause for the alleged RICO violation because it was "unclear how either Mallinckrodt or Express Scripts communicated <u>any</u>, 'misrepresentations,' let alone communications made directly, to either [plaintiff]." *Id.* at 775. The court dismissed the fraud and conspiracy to defraud claims upon similar reasoning. *Id.* at 776–77.

### 2. The Washington County Case

In June 2019, Plaintiffs' counsel in this case filed a complaint in the District of Maryland on behalf of the Washington County Board of Education against Mallinckrodt, the Express Scripts Entities, and a former board member of Questcor. *Wash. Cnty. Bd. Of Educ. v. Mallinckrodt ARD, Inc.*, No. 1:19-cv-01854 (D. Md.). The amended complaint alleged that the defendants raised Acthar's price through similar schemes alleged here, raising claims of violation of the Maryland Consumer Protection Act ("MCPA"), negligent misrepresentation, fraud, unjust enrichment, and conspiracy to defraud. *Wash. Cnty. Bd. of Educ.*, No. 1:19-cv-01854 (Dkt. No. 36); s*ee Wash.*

13

*Cnty. Bd. of Educ. v. Mallinckrodt ARD, Inc.*, 431 F. Supp. 3d 698 (D. Md. 2020). The court granted the defendants' motions to dismiss on all counts.

With respect to the MCPA claim, the court found that the plaintiff failed to identify any actionable misrepresentation—Mallinckrodt and Express Scripts disclosed their decision to enter into an exclusive distributorship in 2007, the "artificial" and "inflated" AWPs of Acthar did not constitute false representations, plaintiff failed to allege that it relied on the allegedly false statements to the market about Acthar's price, plaintiff failed to identify a misrepresentation related to the PAP, and plaintiff failed to allege it actually received any false information from KOLs. *Id.* at 711–14. As for the negligent misrepresentation claim, the court held the Acthar Start Form could not serve as the basis for the plaintiff's negligent misrepresentation claim because (1) plaintiff did not allege it ever saw the Acthar Start Form, and (2) the assertion that plaintiff relied on the alleged misstatements in the form was conclusory. *Id.* at 716. The court also dismissed the fraud claim because "there is nothing inherently fraudulent about charging a high price for a product." *Id.* at 717.

### 3.  *The Steamfitters Case*

In July 2019, Plaintiffs' counsel in this case filed a class action complaint in this district against Mallinckrodt and UBC on behalf of Steamfitters Local Union No. 420 ("Steamfitters") and similarly situated TPPs. *Steamfitters Local Union 420 v. Mallinckrodt ARD, LLC, et al.*, No. 2:19-cv-03047 (E.D. Pa.). The complaint alleges violations of the federal RICO statute and state consumer fraud laws related to Mallinckrodt and UBC's marketing and distribution of Acthar. In a December 19, 2019 one-page order issued by Judge Schiller, the court denied the defendants' motions to dismiss. *Steamfitters*, No. 2:19-cv-03047 (E.D. Pa.) (Dkt. No. 57).

In August 2023, the *Steamfitters* case was reassigned to this Court. *Steamfitters*, No. 2:19-cv-03047 (E.D. Pa.) (Dkt. No. 131). Defendant UBC argued that the *Steamfitters* proceedings should be bifurcated based on the potential collateral estoppel effects of the decision of *In re Mallinckrodt PLC*, 638 B.R. 57 (Bankr. D. Del. 2021), which was issued as part of Mallinckrodt's Bankruptcy Proceedings. *See, e.g.*, *Steamfitters*, No. 2:19-cv-03047 (E.D. Pa.) (Dkt. No. 113). In an October 31, 2025 order and memorandum, this Court denied Defendant's request to bifurcate and found that the Bankruptcy court's decision did not act as collateral estoppel to Plaintiff's claims. *Steamfitters*, No. 2:19-cv-03047 (E.D. Pa.) (Dkt. Nos. 152, 153).

### 4. *The Plumbers Case*

In November 2019, Plaintiffs' counsel in this case filed a class action complaint in the District of New Jersey on behalf of the United Association of Plumbers & Pipefitters Local 322 of Southern New Jersey ("Plumbers") and similarly situated TPPs against Mallinckrodt and the Express Scripts Entities, as well as an individual sales specialist. *Plumbers & Pipefitters Local 322 of S.N.J. v. Mallinckrodt ARD, LLC*, et al., No. 1:20-cv-00188 (D.N.J.). Similar to the allegations in the *Rockford* and *Steamfitters* matters, the amended complaint alleged that the Express Scripts Entities and Mallinckrodt violated the New Jersey Antitrust Act and the New Jersey Consumer Fraud Act by illegally "maintain[ing] and enhanc[ing] Mallinckrodt's monopoly power in the ACTH market" by "agree[ing] to maintain the supracompetitive prices of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market." *Plumbers*, No. 1:20-cv-00188 (Dkt. No. 50 ¶¶ 611, 614). The amended complaint also alleged that the Express Scripts Entities and Debtors violated New Jersey RICO by "creat[ing] [an] exclusive distribution arrangement to limit and control distribution and output of Acthar, and to raise the prices of Acthar to unconscionable levels," "willfully manipulat[ing] and

inflat[ing] the prices paid by TPPs for Acthar." *Id.* ¶ 10. The amended complaint also brought negligent misrepresentation, civil conspiracy, and unjust enrichment claims.

The *Plumbers* court granted the Express Scripts Entities' motion to dismiss. *United Ass'n of Plumbers & Pipefitters Local 322 of S. N.J. v. Mallinckrodt ARD, LLC*, 2020 WL 5627149 (D.N.J. Aug. 18, 2020). The court looked to caselaw on the federal RICO statute when interpreting New Jersey's RICO statute. *Id.* at 17. Similar to the *Rockford* court, the *Plumbers* court dismissed the RICO claims because plaintiff failed to meet Rule 9(b)'s pleading standard for the predicate crimes of wire and mail fraud. *Id.* at 18. The court explained that plaintiff did not identify any specific misrepresentations made in the course of the distribution scheme, and plaintiff failed to supply any allegations that statements concerning Acthar's price were false. *Id.* Finally, with respect to the marketing scheme, the court held that plaintiff's allegations of off-label marketing were conclusory and/or failed to establish that the alleged misrepresentation actually resulted in more Acthar prescriptions. *Id.* at 18–19. The plaintiff also failed to explain why Mallinckrodt's non-disclosure of its payments to KOLs and role in the PAP amounted to actionable omissions. *Id.* The *Plumbers* court rejected plaintiff's negligent misrepresentation claim for similar reasons.

### 5. *The County of Dakota, Nebraska*

On August 16, 2024, Plaintiffs' counsel in this case filed a complaint in this Court asserting "virtually identical" claims to those in the present case (ECF No. 29 at 6) against the Express Scripts Entities on behalf of the County of Dakota, Nebraska; the Sheet Metal Workers Local No. 40 Health Fund; the Harlem School District 122; and Dustin's Bar-B-Q Inc. *The Cnty. of Dakota, Neb. v. United BioSource Corp.*, No. 24-cv-04276 (E.D. Pa.) (Dkt. No. 1). On March 5, 2026, this Court granted the Express Scripts Entities' motion to dismiss, dismissing plaintiffs' state law claims with prejudice as time-barred and dismissing their federal RICO and antitrust claims

without prejudice with leave to amend. *The Cnty. of Dakota, Neb.*, No. 24-cv-04276 (E.D. Pa.) (Dkt. No. 42).

## II.    LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff will likely prevail on the merits, but simply accepts as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002). While a complaint does not need detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, a complaint must provide more than labels and conclusions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[C]onclusory or 'bare-bones' allegations will [not] survive a motion to dismiss." *Fowler v. UPMC Shadyside*, 578 F.3d 203*,* 210 (3d Cir. 2009). "To prevent dismissal, all civil complaints must now set out 'sufficient factual matter' to show that the claim is facially plausible." *Id*. In evaluating a complaint on a motion to dismiss, the Third Circuit has directed courts do the following: (1) identify the elements of the claim, (2) review the complaint to strike conclusory allegations, and then (3) look at the well-pleaded components of the complaint and evaluate whether all of the elements identified in part one of the inquiry are sufficiently alleged. *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

Federal Rule of Civil Procedure 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." In order to satisfy Rule 9(b)'s particularity requirement, a plaintiff must "state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which

[it is] charged" and "plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (internal citations omitted). In short, a plaintiff must provide "the who, what, when, where and how of the events at issue." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (internal quotations omitted).

### III.    DISCUSSION

#### i.    Rule 8

Federal Rule of Civil Procedure 8 requires that a complaint contain a "short and plain statement of the claim" and be "simple, concise, and direct." Defendants urge this Court to dismiss the Complaint for failure to comply with Rule 8's requirements. (ECF No. 24-1 at 26–30.) Defendants note that the 190-page Complaint is "replete with conclusory, vague, and immaterial facts." (ECF No. 24-1 at 27 (quoting *Bartol v. Barrowclough*, 251 F. Supp. 3d 855, 859 (E.D. Pa. 2017)).) For example, Defendants assert that Plaintiffs concede that their claims are not based on off-label marketing or Acthar's safety or efficacy, yet devote dozens of paragraphs in the Complaint to these issues; Plaintiffs do not allege that any Express Scripts Entities paid doctors, yet spend pages of the Complaint describing Mallinckrodt's alleged doctor bribery scheme; and Plaintiffs devote significant space in the Complaint to discuss Mallinckrodt's acquisition of Synacthen, yet fail to allege that the Express Scripts Entities had any role in this acquisition. (*See* ECF No. 24-1 at 27.) For the reasons further explained in this opinion, this Court agrees with Defendants that the Complaint is both imprecise and overinclusive in parts, while completely contradictory in others. However, viewed in totality the Court does not find that these shortcomings result in a violation of Rule 8.

With this in mind, the Court notes the Complaint's shortcomings throughout this opinion. Any falsehoods apparent from the face of court documents incorporated by reference into the Complaint or contradictions within the Complaint itself have not been accepted by this Court as true. (*See* ECF No. 24-1 at 28–29; ECF No. 46-1 at 8–9); *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 151–52 (2d Cir. 2014) ("Although factual allegations of a complaint are normally accepted as true on a motion to dismiss . . . that principle does not apply to general allegations that are contradicted 'by more specific allegations in the Complaint.'") (collecting cases). Moreover, Plaintiffs refer throughout the Complaint to prior actions and conduct that do not implicate Defendants at all. If the Court struck from the Complaint all paragraphs that do not relate to Defendants in some way, the 190-page complaint would be whittled down significantly, illuminating just how sparse the allegations pertaining directly to Defendants are.

## ii.    Collateral Estoppel

Defendants argue that the Bankruptcy Proceedings should act as collateral estoppel to Plaintiff's Complaint. (*See, e.g.*, ECF No. 24-1 at 23–26.) As discussed above, this Court has already considered and rejected this argument in the *Steamfitters* case and that rejection is equally applicable here. *Steamfitters*, No. 2:19-cv-03047 (E.D. Pa.) (Dkt. Nos. 152, 153).

Plaintiffs also raise collateral estoppel arguments in their response in opposition. They argue that "Express Scripts should be collaterally estopped from re-arguing the prior ruling" in *Rockford* and *Steamfitters*. (ECF No. 29 at 6.) As the *Plumbers* court stated in response to the same assertion, "Plaintiff's argument is absurd." 2020 WL 5627149, at *10. Neither decision in *Steamfitters* nor *Rockford* was a final judgment on the merits, meaning the doctrine of collateral estoppel is inapplicable. *See Gross-Quatrone v. Mizdol*, 811 F. App'x 95, 97 (3d Cir. 2020).

19

Beyond that, Plaintiffs rely heavily in their brief on the similarities between the *Steamfitters* case and this one, coupled with Judge Schiller's decision denying the *Steamfitters* defendants' motions to dismiss. (ECF No. 29 at 6, 8, 20–22, 25–27, 29.) With due respect to the *Steamfitters*' court's decision, the *Steamfitters* order is not controlling.[10] Thus, this Court has considered the opinions and analysis of each district court that has addressed similar issues to those presented in this action. But again, while the opinions of other jurists sitting in a similarly situated posture as this Court can often offer helpful guidance, their opinions are not binding on this Court. *See Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 428 (2011) ("[F]ederal district judges, sitting as sole adjudicators, lack authority to render precedential decisions binding other judges, even members of the same court.").

### iii.    Antitrust Claims

Plaintiffs bring two antitrust claims: (1) a Sherman Act Section 1 restraint of trade claim (Count 8), 15 U.S.C. § 1; and (2) a Sherman Act Section 2 maintenance of monopolization claim (Count 7). Plaintiffs have not addressed Defendants' arguments to dismiss the antitrust claims in their opposition brief.

"A response in opposition to a motion to dismiss that fails to respond to a substantive argument is a waiver or abandonment of that claim." *Perez v. IMA Grp.*, No. CV 23-4367, 2024 WL 2925960, at *2 (E.D. Pa. June 10, 2024) (citing *Dreibelbis v. Scholton*, 274 F. App'x 183, 185 (3d Cir. 2008)); *see Levy-Tatum v. Navient Sols., Inc.*, 183 F. Supp. 3d 701, 712 (E.D. Pa. 2016) (collecting cases). Apart from their arguments that Defendants are collaterally estopped from bringing arguments previously rejected by the *Rockford* and *Steamfitters* courts, which, as

---

[10] The *Steamfitters* decision included only a singular sentence regarding the indirect purchaser rule in support of the denial of the defendants' motions to dismiss.

discussed, are legally unsound, and arguments regarding the direct purchaser status of Plaintiffs for purposes of antitrust standing (ECF No. 29 at 21–22), Plaintiffs do not respond to *any* of the Express Scripts Entities' arguments concerning the merits of their antitrust claims in their 31-page opposition brief. The Court hereby dismisses the antitrust claims (Counts 7–8) without prejudice.

### iv.    Federal RICO

Plaintiffs bring claims for violation of RICO and conspiracy to violate RICO under 18 U.S.C. § 1962(c) and (d) (Counts 1 & 2). While the Complaint states that the violation of RICO claim is against all Defendants (Compl. ¶¶ 595–611) and the RICO conspiracy claim is against UBC only (*id.* ¶¶ 612–629), Plaintiffs write in their Opposition to the Motion to Dismiss that both federal RICO claims "are **against UBC only**." (ECF No. 29 at 22 (emphasis in original).) As such, the Court proceeds with this analysis based on Plaintiffs' assertion that these claims only pertain to Defendant UBC.

To state a RICO claim, a plaintiff must plead: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Lum v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir. 2004), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). A claim of a pattern of racketeering activities requires at least two predicate acts of racketeering activity. *Kolar v. Preferred Real Est. Invs., Inc.*, 361 F. App'x 354, 362 (3d Cir. 2010). Here, Plaintiffs allege the predicate acts of mail fraud and wire fraud. 18 U.S.C. §§ 1341, 1343; (Compl. ¶¶ 599, 605). The elements of a mail fraud claim are "(1) a scheme or artifice to defraud for the purpose of obtaining money or property and (2) use of the mails in furtherance of the scheme." *United States v. Rashid*, 39 F. Supp. 3d 649, 653 (E.D. Pa. 2014), *aff'd sub nom. Rashid v. Warden Phila. FDC*, 617 F. App'x 221 (3d Cir. 2015). The elements of wire fraud are "(1) knowing and willful

21

participation in a scheme or artifice to defraud, (2) with specific intent to defraud, and (3) use of interstate wire communications in furtherance of the scheme." *Id.* (internal quotations omitted).

In order to successfully plead wire and mail fraud, Plaintiffs must plead a fraudulent misrepresentation or omission with particularity under Rule 9(b)'s particularity standard. *Humana, Inc. v. Indivior, Inc.*, No. 21-2573, 2022 WL 17718342, at *3 n.30 (3d Cir. Dec. 15, 2022); *Marangos v. Swett*, 341 F. App'x 752, 756 (3d Cir. 2009). Plaintiffs argue that the "mail and wire statutes do not require a misrepresentation or omission; a scheme or artifice suffices." (ECF No. 29 at 26.) This argument not only perplexes the Court but misstates the law. The statute requires a "scheme or artifice *to defraud*." *Lum v. Bank of Am.*, 361 F.3d at 223 (a mail or wire fraud scheme "must involve some sort of fraudulent misrepresentation or omission"). One cannot defraud without making some sort of fraudulent misrepresentation or omission.

Rule 9(b) also requires Plaintiffs to identify the "who, what, when and where details" of the alleged fraud. *DiGiglio v. U.S. Xpress, Inc.*, 293 F. Supp. 3d 522, 527 (E.D. Pa. 2018), *aff'd*, 2018 WL 11449580 (3d Cir. Apr. 24, 2018). Plaintiffs fail to plead that UBC made a fraudulent misrepresentation or omission that meets the particularity requirement of Rule 9(b) in relation to any of the alleged schemes in the Complaint. At the outset, the Court notes that Plaintiffs make various allegations about misrepresentations made by parties other than UBC and non-parties. These allegations do not support allegations of RICO violations as to UBC. (*See, e.g.*, Compl. ¶¶ 315, 320 (describing allegedly misleading statements by Mallinckrodt's CEO and Mallinckrodt's press releases about the price of Acthar).)

Plaintiffs also dedicate many paragraphs to Mallinckrodt's "white coat marketing scheme" that used and bribed MSLs and KOLs to promote prescriptions of Acthar for unapproved uses and doses. (*See, e.g.*, *id.* ¶¶ 357–79, 383–87.) However, when it comes time to link the "white coat

22

marketing scheme" to UBC, Plaintiffs cursorily state that these spokes-doctors were "important spokes in the wheel of Mallinckrodt's RICO conspiracy, as they are all connected to Mallinckrodt's self-described 'HUB' at UBC and all profit as integral 'spokes' in the Mallinckrodt-UBC marketing and sales scheme." (*Id.* ¶ 379.) However, nothing more is offered to support this claim, and Plaintiffs do not explain UBC's role in the alleged scheme. In short, Plaintiffs fall far below Rule 9(b)'s standard, and any supposed misrepresentations related to the KOLs and MSLs cannot support that UBC committed the predicate acts for a RICO violation.[11]

The Complaint's allegations that *do* directly pertain to UBC in support of Plaintiffs' RICO claims fall into the following categories: (1) misrepresentations regarding Acthar's uses, efficacy, safety, and benefits (*see, e.g.*, *id.* ¶¶ 422–24) and (2) misrepresentations regarding the reasons for Acthar's inflated price, its value relative to that price, and how the PAP affected that price (*see, e.g.*, *id.* ¶¶ 179–89, 424, 607).

First, Plaintiffs allege that UBC and its Reimbursement Specialists promoted Acthar for off-label indications and made misrepresentations about its uses and safety, including its relative efficacy as compared to other cheaper drugs available. (*See, e.g.*, *id.* ¶¶ 169, 182, 184, 206, 207, 268, 423–24.) Plaintiffs contradict themselves multiple times regarding this aspect of the scheme. The Complaint discusses at length how the FDA regulates drug marketing and the uses for which drugs may be marketed, (*id.* ¶¶ 129–63), as well as the dangers of Acthar for unapproved uses and

---

[11] The same is true of Plaintiffs' claims against Dr. David Mandel, against whom Plaintiffs do not bring this claim according to their opposition. Plaintiffs state that Dr. Mandel misrepresented the Acthar mechanism of action and its limited FDA approval. (Compl. ¶¶ 102, 398) When TPPs denied Acthar prescriptions, Dr. Mandel sent letters appealing those denials to UBC, which then directed them to the payor. (*Id.* ¶¶ 103–04, 395.) These letters allegedly contained false and misleading statements about the "limited FDA approval of Acthar and its purported [mechanism of action]." (*Id.* ¶¶ 103, 396.) However, the only connection to UBC alleged is that UBC directed these letters to the payors. This is insufficient to attribute those misrepresentations to UBC.

doses (*id.* ¶¶ 225–28.) However, the Complaint also states that "[t]he standards that govern the FDA safety and effectiveness requirements . . . have no bearing on the civil claims at issue because Plaintiffs' claims are not dependent upon any FDA standard or approval." (*Id.* ¶ 132; *see also id.* ¶ 138 ("The civil claims at issue in this case do not arise out of or depend upon the Acthar label, FDA approval (or lack thereof) or the safety or efficacy of Acthar.").) The Complaint then discusses how the Express Scripts Entities falsely promoted Acthar as "purportedly 'approved for 19 indications.'"[12] (*Id.* ¶¶ 169, 171.) The Court is perplexed as to how Plaintiffs may assert that their claims do not depend "upon any FDA standard," "FDA approval (or lack thereof) or the safety or efficacy of Achtar" (*id.* ¶¶ 132, 138), yet premise their RICO claims upon "mail or wire fraud in the form of deceptive advertising and misrepresentations, as well as concealment of material facts about Acthar, in order to mislead health care professionals and/or consumers and TPPs about the safety, efficacy and value of Acthar which caused Plaintiffs to pay [more] for Acthar than it would have absent Defendants' fraud." (*Id.* ¶¶ 172–73.) Plaintiffs' allegations are in conflict and thus are insufficient to serve as misrepresentations underlying the predicate acts of a RICO violation.

Even if these assertions were not in conflict, "off-label marketing is not per se fraudulent." *Indiana/Kentucky/Ohio Reg'l Council of Carpenters Welfare Fund v. Cephalon, Inc.*, No. CIV.A. 13-7167, 2014 WL 2115498, at *5–6 (E.D. Pa. May 21, 2014) (collecting cases) (finding that the plaintiff failed to adequately allege a misrepresentation or omission based on off-label prescriptions and promotion of a drug with sufficient specificity, even where the defendant's

---

[12] What is more, Plaintiffs contend in one paragraph of the Complaint that Acthar actually *was* approved for 19 indications. (*Compare* Compl. ¶ 169 (alleging Acthar was falsely marketed as being "approved for 19 indications"), *with id.* ¶ 123 (admitting Acthar has been approved to treat 19 indications in the "present-day").)

conduct may have constituted "improper off-label promotion" under the relevant regulations). There is no allegation that UBC actively concealed information about what Acthar's indications were. In fact, Plaintiffs allege that the SOP Mallinckrodt created for UBC stated that indications that were "not listed on the manufacturer's package insert as an approved FDA diagnos[is]" were "considered off label." (Compl. ¶¶ 181–82.) That UBC would accept incoming referrals that fall into the "off label" category does not in and of itself constitute a misrepresentation, nor do Plaintiffs plead with specificity why it would be. (*See id.* ¶ 182);[13] *see Travelers Indem. Co. v. Cephalon, Inc.*, 32 F. Supp. 3d 538, 551 (E.D. Pa. 2014) (dismissing claims that showed "no more than [Defendant's] off-label promotion . . . which does not by itself state a claim for fraud or misrepresentation").

Second, Plaintiffs allege that UBC, at the direction of Mallinckrodt, made representations regarding the reasons for Acthar's inflated price, its value relative to that price, and that the price itself was a misrepresentation. (*See, e.g.*, Compl. ¶¶ 183–89.) Plaintiffs allege that the talking points Mallinckrodt gave UBC included misrepresentations about why the price of the drug had increased. (*Id.* ¶¶ 187–89.) These talking points explained that the increase in price was necessary to ensure the drug's "long term viability and availability" and that it had "never been a profitable drug because it is not only a difficult and expensive drug to manufacture, but is also a highly specialized, very low volume product." (*Id.* ¶ 183.) Additionally, the talking points explained that

---

[13] The fact that the 2007 SOP and other custodial files related to the ASAP program were allegedly destroyed (*id.* ¶¶ 176–78) does not resuscitate Plaintiffs' claims. Plaintiffs cannot circumvent Rule 9(b)'s requirements by vaguely alleging their claims are based on almost twenty-year-old documents that it has discovered were destroyed in a different litigation. *See* Fed. R. Civ. P. 11(b)(3).

the NORD set up a rationing program for Acthar in the 1990s since it was often not available then. (*Id.* ¶ 183.)

Under Rule 9(b), Plaintiffs must identify the "who, what, when and where details" of the alleged fraud. *DiGiglio v. U.S. Xpress, Inc.*, 293 F. Supp. 3d 522, 527 (E.D. Pa. 2018), *aff'd*, 2018 WL 11449580 (3d Cir. Apr. 24, 2018). While Plaintiffs do allege *what* the allegedly misleading price statements were, they do not allege *when* or to *whom* they were made. Instead, they vaguely state that "one or more of the above misrepresentations 'about why the price was increased' were repeated to representatives of the Plaintiffs, their beneficiaries and/or their medical providers with the knowledge that these persons would rely upon such misrepresentations to the detriment of Plaintiffs, in order that Plaintiffs would be induced to pay for Acthar at the high price." (Compl. ¶ 185.) However, these general allegations regarding who the misrepresentations were made to—including the possibility that they were not even made to Plaintiffs, but to their beneficiaries or medical providers—are broad and simply not enough to comply with Rule 9(b)'s particularity requirement. *See Rockford*, 360 F. Supp. 3d at 775 (holding it was "unclear how either Mallinckrodt or Express Scripts communicated <u>any</u>, 'misrepresentations,' let alone communications made directly, to either [plaintiff].").

Finally, charging high prices does not render the price "false" or constitute an actionable misrepresentation or omission. *See Rockford*, 360 F. Supp. 3d at 777 ("[H]igh prices do not in and of themselves constitute false representations."); *Wash. Cnty.*, 431 F. Supp. 3d at 712–13 (same); *Pipefitters*, 2020 WL 5627149, at *20 (same). The statements by Express Scripts' Chief Medical Officer and Vice President regarding the high price of Acthar, which they assert was set by Mallinckrodt, do not render a different result. (Compl. ¶¶ 331, 333.) If anything, these statements support that the Express Scripts Entities did not have a role in setting the price of the drug.

Nor do the "PAP services run by UBC" constitute actionable misrepresentations or omissions. (*Id.* ¶¶ 441–45.) Plaintiffs assert that the PAP allowed Mallinckrodt, with UBC's assistance, to "shift the high costs of Acthar to private payors, like Plaintiffs and their beneficiaries." (*Id.* ¶ 427.) Plaintiffs allege that this constituted an omission by somehow "circumvent[ing] patient complaints" and preventing "TPP advance awareness about Acthar's high prices." (*Id.* ¶ 426.) They detail allegations related to PAP use by IOUE Local 542, a non-party to this action. (*Id.* ¶¶ 433–37.) Once again, these claims do not allege with any particularity how the PAP services misled Plaintiffs *in this action*. What is more, Plaintiffs fail to explain how funds used to assist patients with their copays somehow precluded TPPs from knowing the price of Acthar. In fact, this allegation contradicts Plaintiffs' other allegations regarding UBC's use of talking points to explain to TPPs why the price of Acthar was so high. It stands to reason these talking points would not have to be used if the price of the drug was not actually disclosed to TPPs.

In short, the Complaint is framed with extensive allegations and conjecture that, when opened, is hollow and devoid of the fundamental substance that is needed. Plaintiffs fail to allege any misrepresentations or omissions with the particularity required by Rule 9(b) and therefore their RICO claim must be dismissed. Because the Court finds Plaintiffs have failed to state a claim for violation of the RICO statute under § 1962(c), their claim for conspiracy to violate RICO under § 1962(d) must also fail. *See Lum v. Bank of Am.*, 361 F.3d at 227 n.5 ("Any claim under § 1962(d) based on an alleged conspiracy to violate the other subsections of § 1962 necessarily must fail if the substantive claims are themselves deficient.").

Additionally, Plaintiffs bring arguments about the application of *Illinois Brick* and their "direct purchaser" standing as these issues pertain to their RICO claims, although Defendants do not actually bring these challenges in their briefs. (ECF No. 29 at 22–20; ECF No. 30 at 18 n.7.)

In light of the decision that Plaintiffs have not otherwise adequately pled their RICO claims, the Court need not reach these other issues.

### v.    Remaining State Law Claims

Defendants argue that Plaintiffs' state law claims (Counts 3–6, 9) are barred by the applicable statutes of limitations. (ECF No. 24-1 at 33–35.) This Court agrees.

"A complaint is subject to dismissal for failure to state a claim on statute of limitations grounds only when the statute of limitations defense is apparent on the face of the complaint." *Wisniewski v. Fisher*, 857 F.3d 152, 157 (3d Cir. 2017). Plaintiffs assert that this Court has diversity jurisdiction over the matter. (Compl. ¶ 76.) As a federal district court adjudicating state law claims, the Court must apply the choice of law rules of the forum state—Pennsylvania. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). In Pennsylvania, the limitations period on foreign claims "shall be either that provided or prescribed by the law of the place where the claim accrued or by the law of this Commonwealth, **whichever first bars the claim**." 42 Pa. C.S. § 5521(b) (emphasis added). In making this assessment, the Court also considers which tolling doctrine—that of Pennsylvania or that where the claim accrued—first bars the claim. *See Ross v. Johns-Manville Corp.*, 766 F.2d 823, 827 (3d Cir. 1985); *Hurley v. BMW of N. Am., LLC*, No. CV 18-5320, 2020 WL 1624861, at *9 (E.D. Pa. Apr. 2, 2020) ("When proceeding under diversity jurisdiction, this Court applies the law of Pennsylvania with regard to tolling."); *Frankentek Residential Sys., LLC v. Buerger*, 15 F. Supp. 3d 574, 581 (E.D. Pa. 2014); *Jacobs v. Halper*, 116 F. Supp. 3d 469, 479 (E.D. Pa. 2015).

In looking to Pennsylvania law, this Court finds that the two prior federal class actions against the Express Scripts Entities related to Acthar—*Rockford* and *Steamfitters*—cannot toll limitations for Plaintiffs' state law claims due to Pennsylvania's bar on cross-jurisdictional tolling.

*Hurley*, 2020 WL 1624861, at *9. Under this rule, a Pennsylvania court would not toll the statute of limitations on state law claims based on the filing of a federal class action. *See Conyers-Carson v. Albert Einstein Med. Ctr.*, No. 140601960, 2015 WL 3512326, at *2 (Pa. Com. Pl. May 12, 2015) ("Pennsylvania courts have repeatedly, and unambiguously, stated that the filing of an action in federal court does not toll the running of the relevant, state law-based statutes of limitations.") (collecting cases). *American Pipe* tolling, which Plaintiffs argue applies, is a federal doctrine and therefore does not apply. The Complaint's state law claims thus do not benefit from tolling.

Under Pennsylvania law, a cause of action accrues for statute of limitations purposes when the plaintiff could have first maintained a viable cause of action. *William A. Graham Co. v. Haughey*, 646 F.3d 138, 146 (3d Cir. 2011). Here, Plaintiffs' alleged injuries lie in their purchases of Acthar, and thus their claims accrued at the time that they purchased the drug. The latest initial purchase of Acthar by Plaintiffs was January 23, 2017. (Compl. ¶¶ 71–72, 88.) This was more than seven years before the Complaint was filed on October 2, 2024. As Plaintiffs state in their response in opposition, the claims asserted in this action are "modeled" after those in the *Rockford* action, which was filed in April 2017. (ECF No. 29 at 20, 31.) The Court sees no reason, and Plaintiffs have not provided such a reason, as to why Plaintiffs would not have been able to bring the claims asserted herein at the time the *Rockford* action was filed. Regardless of whether Plaintiffs' claims accrued April 2017 or January 2017, they are untimely.

Turning to the applicable statutes of limitations, the Court finds that each has been passed by a number of years under the relevant law. In analyzing the foreign state limitations period for the Ohio Consumer Sales Protection Act ("OCSPA"), this Court looks again to the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") as the analogous claim under Pennsylvania law. 73 P.S. § 201-1, *et seq.* The limitations period for the UTPCPL is six years. 42

Pa. C.S.A. § 5527(6). However, the limitations period for an OCSPA claim under Ohio law is two years. Ohio Rev. Code § 1345.10(C). Because Ohio law first bars the claim, Ohio law applies, meaning that Plaintiffs were required to file their complaint in this action by April of 2019, at the latest. The OCSPA claim is therefore untimely.[14]

Turning to Plaintiffs' negligent misrepresentation and unjust enrichment claims, Plaintiffs appear to contemplate the application of Pennsylvania law. (Compl. ¶ 671 (citing *Bilt-Rite Contrs, Inc. v. Architectural Studio*, 866 A.2d. 270, 273 n.1 (Pa. 2005)); ECF No. 29 at 27, 29–30). Under Pennsylvania law, the relevant statute of limitations for negligent misrepresentation is two years. 42 Pa. C.S. § 5524(7). The applicable statute of limitations for unjust enrichment is four years. *Id.* § 5524(4); *Harry Miller Corp. v. Mancuso Chemicals Ltd.*, 469 F. Supp. 2d 303, 319 (E.D. Pa. 2007). Therefore, the statute of limitations expired for Plaintiffs' negligent misrepresentation claim in April of 2019 and for the unjust enrichment claim in April of 2021. The negligent misrepresentation and unjust enrichment claims are therefore dismissed as untimely.

Finally, Plaintiffs' aiding and abetting and conspiracy to defraud claims are ambiguous as to what state's laws apply. They appear to assert that the claims are governed by the "laws of the states in which each of the Plaintiffs reside," which is Ohio. (Compl. ¶¶ 41, 81, 85, 692.) However, Ohio law does not contemplate separate causes of action for aiding and abetting a tortious act or civil conspiracy. *Wells Fargo v. Smith*, 2013 WL 938069, at *7 (Ohio Ct. App. 2013) ("A person is liable only if he engages in behavior that is unlawful and not simply because he aided or abetted wrongful conduct."); *DeVries Dairy, LLC v. White Eagle Coop. Ass'n, Inc.*, 974 N.E.2d 1194,

---

[14] Plaintiffs fail to even mention their OCSPA claims in their Opposition to the Motion to Dismiss, which is alone grounds for dismissal. *Dreibelbis*, 274 F. App'x at 185.

1194 (Ohio 201).[15] Therefore, these claims are legally insufficient under Ohio law. Alternatively, if Pennsylvania law applies to these two claims, the applicable statute of limitations for each is two years. *Env't Equip. & Serv. Co. v. Wachovia Bank, N.A.*, 741 F. Supp. 2d 705, 727 (E.D. Pa. 2010) (aiding & abetting); *Hvizdak v. Citizens Bank of Pennsylvania*, 2015 WL 4878639, at *5 (W.D. Pa. Aug. 6, 2015) (conspiracy). Therefore, Plaintiffs' aiding and abetting and conspiracy claims expired in April of 2019, and the claims are therefore dismissed as untimely if they are brought under Pennsylvania law.

Finally, to the extent that Plaintiffs' claim for declaratory and injunctive relief relies on the state claims dismissed as time-barred herein, that claim is also dismissed. *See Algrant v. Evergreen Valley Nurseries Ltd. P'ship*, 126 F.3d 178, 185 (3d Cir. 1997).

Plaintiffs argue that the doctrines of continuing violations and fraudulent concealment, as well as the discovery rule save their claims from application of the statutes of limitations and that those defenses are "well-pleaded in the Complaint." (ECF No. 29 at 24.) However, the Court finds that none of these doctrines save the lack of timeliness of Plaintiffs' claims. Under the doctrine of fraudulent concealment, "the statute [of limitations] is tolled until plaintiffs knew or using reasonable diligence should have known of the claim." *Hurley*, 2020 WL 1624861, at *9 (citing *Vernau v. Vic's Market, Inc.*, 896 F.2d 43, 46 (3d Cir. 1990)). Similarly, the discovery rule tolls the statute of limitations "whenever the plaintiff, despite the exercise of reasonable diligence, is unable to know of the existence of the injury and its cause." *Bohus v. Beloff*, 950 F.2d 919, 926 (3d Cir. 1991). "The statute of limitations begins to run as soon as the plaintiff has discovered or,

---

[15] Plaintiffs do not refute in their opposition to the Express Scripts Entities' Motion to Dismiss that Ohio law does not contemplate a cause of action for aiding and abetting or conspiracy to defraud/concerted action. (*See* ECF No. 30 at 24.)

exercising reasonable diligence, should have discovered the injury and its cause." *Id.* at 925. As discussed above, Plaintiffs should have known of their claims at least by the time the *Rockford* complaint was filed, given the similarities between the complaints and the fact that Plaintiffs in this action were part of the *Rockford* class.

Finally, the continuing violations doctrine holds an action timely when "a defendant's conduct is part of a continuing practice . . . so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time-barred." *Beltz v. Erie Indem. Co.*, 279 F. Supp. 3d 569, 582 (W.D. Pa. 2017), *aff'd*, 733 F. App'x 595 (3d Cir. 2018). However, the doctrine requires the court to focus on "affirmative acts" rather than the effects of such acts. *Id.* The Complaint alleges that the exclusive arrangement between the Express Scripts Entities and Mallinckrodt lasted from 2007 through 2017. (Compl. ¶ 716.) It does not contain any allegations of affirmative acts within the limitations period—that is, between April 2017 when the causes of action accrued if the Court is to use the date that the *Rockford* complaint was filed, and April 2019, when the latest statute of limitations expired—that could constitute a "continuing practice," nor do Plaintiffs explain what conduct would qualify as a "continuing practice" in their opposition. (ECF No. 29 at 24.)

Therefore, under relevant state law, the limitations periods have passed on Plaintiffs' aforementioned state law claims (Counts 3–6, 9), and they are dismissed with prejudice.

### vi.    Declaratory and Injunctive Relief

Because Plaintiffs' substantive state law claims fail, as discussed *infra*, their request for declaratory and injunctive relief based on these claims (Count 10) necessarily fails as well. *See Ally Fin., Inc. v. Mente Chevrolet Oldsmobile, Inc.*, 2012 WL 4473240, at *9 (E.D. Pa. Sept. 28, 2012). To the extent Plaintiffs' request for declaratory and injunctive relief is based on the federal

claims discussed herein and dismissed without prejudice, the Court will make its determination as to the appropriateness of declaratory and injunctive relief for those claims when and if Plaintiffs choose to replead them.

## IV.   CONCLUSION

For the reasons discussed herein, the Court hereby grants the Motions to Dismiss with prejudice as to Counts 3–6 and 9, and without prejudice as to Counts 1–2 and 7–8. Count 10 is dismissed with prejudice as it pertains to Counts 3–6 and 9 and is dismissed without prejudice as it pertains to Counts 1–2 and 7–8. The Court grants Plaintiffs leave to replead within 21 days of the date of this order to correct the deficiencies as noted in this opinion. An appropriate order follows.

**BY THE COURT:**

**/s/ Hon. Kelley B. Hodge**

**HODGE, KELLEY B., J.**